## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**TRACIE L. ELLISON,**

    **Plaintiff,**

    **v.**                                     **Case No. 21-CV-821-SCD**

**KILOLO KIJAKAZI,**
  *Acting Commissioner of Social Security,*

    **Defendant.**

---

## DECISION AND ORDER

---

    Tracie Ellison applied for social security disability benefits and supplemental security income based on a combination of musculoskeletal issues. Her claim was denied, and the denial was affirmed by an administrative law judge (ALJ) employed by the Social Security Administration (SSA). The Appeals Council affirmed.

    Ellison now seeks judicial review of the ALJ's decision because she believes that the RFC did not fully account for the combined impact of her conditions on her ability to work. Ellison also argues that the ALJ wrongly discounted medical evidence from her treating doctor. In addition, she argues that the ALJ wrongly failed to submit crucial medical evidence to the state agency consultants. Finally, Ellison argues that the ALJ evaluated her conditions under outdated listings. Kilolo Kijakazi, the Acting Commissioner of the SSA, maintains that the ALJ did not commit reversible error in denying Ellison's claim and substantial evidence supports the ALJ's decision. I agree with Kijakazi; thus, I will affirm the denial of disability benefits.

## BACKGROUND

Plaintiff Tracie Ellison was born in 1978. R. 77.[1] She left high school in 11th grade and did not return to graduate or pursue her GED. R. 54-55. She testified at a hearing before the ALJ that she lives in a trailer with her husband and three children and receives food stamps and medical assistance from the government. R. 55. In the past, she has worked at a resort to assist with banquet setup and cleaned office buildings. R. 56. Ellison testified that she had to stop her work in the cleaning business because she was unable to perform tasks like vacuuming, dusting, and wiping surfaces due to pain in her back, knees, and shoulders. R. 57.

Ellison filed her claims for disability benefits and supplemental security income on June 9, 2017, alleging that her fibromyalgia, weakness in the right leg, lower back pain, and right shoulder tendinitis rendered her unable to work as of January 1, 2015. *See* R. 215. Her claims were denied initially on October 25, 2017, and on reconsideration on March 28, 2018. R. 133, 140. On February 13, 2020, Ellison attended a video hearing before an ALJ. *See* R. 51-75.

Ellison testified about her symptoms during the hearing. She told the ALJ that she had been using a walker for six months because she was unable to walk for long distances. R. 58. Ellison claimed that, without her walker, she could walk only about twenty feet before needing to stop. *Id*. Ellison stated that, while she was still working as a cleaner, she could walk the length of about "three teller lines at a bank" before her back and shoulder pain became too severe to continue. R. 59. Ellison testified that she could stand for about five to ten minutes at a time and could sit for around fifteen minutes before she needed to stand up to alleviate her pain. *Id*. Ellison claimed to be able to lift no more than five pounds and that

---

[1] The transcript is filed on the docket at ECF No. 14-1 to ECF No. 14-26.

Case 1:21-cv-00821-SCD   Filed 09/26/22   Page 2 of 27   Document 25

she required her eldest daughter's help to lift more than that when her work required it. *Id*. She claimed to have trouble bending, stooping, crouching, crawling, and kneeling. *Id*. Ellison stated that she could not reach overhead without her shoulders hurting and could not reach out in front of her without her back hurting. R. 59-60. Even after having hand surgery for her carpal tunnel syndrome (CTS), Ellison reported having difficulty using her hands and "drop[ping] things." R. 60.

Ellison also testified about the ways her symptoms interfered with her daily life. Ellison stated that she could not perform any household chores, including washing dishes, doing laundry, making the bed, vacuuming, dusting, mopping, sweeping, and taking out the garbage, without hurting her back, shoulders, wrists, and knees. R. 60-61. Ellison was able to do some of those activities when she worked as a cleaner but only with the help of her daughter. *Id*. Ellison testified that her pain worsened since she was involved in a car accident in 2018. *Id*. She reported being stiff, tired, and in pain when she wakes up in the morning as a result of her fibromyalgia. R. 73.

In relation to her mental health, Ellison testified that she experienced depression and "feels like a failure" because she cannot do what she used to be able to do. R. 73-74. Ellison testified that she rarely drove and did not attend any churches, clubs, or other community organizations, nor did she go to any school events for her kids, special events, or restaurants. R. 62. Ellison occasionally did small arts and crafts projects like painting rocks or making jewelry. R. 63-64. Ellison reported that she watched TV, but she did not read. *Id*. She used her phone to check her email about once a week, to post to Facebook, and to text using the voice-messaging feature. R. 65-66, 72.

Case 1:21-cv-00821-SCD   Filed 09/26/22   Page 3 of 27   Document 25

The ALJ also heard testimony from a vocational expert (VE). The VE testified that a person with the limitations the ALJ imposed would be able to work in a number of jobs available in significant numbers in the national economy, including as an order clerk, food and beverage; a telephone information clerk; and a document preparer. R. 68.

The ALJ affirmed the denial of benefits in an opinion issued on March 16, 2020. At step one, she found that Ellison had not engaged in substantial gainful activity since the day of onset. R. 21. At step two, the ALJ found that Ellison had nine severe impairments: status post-surgery, right shoulder, secondary to SLAP lesion and impingement; trochanteric bursitis, right hip; status post-partial arthroplasty, left knee, secondary to primary osteoarthritis; lumbar radiculopathy, left lower extremity, secondary to degenerative changes; asthma; status post-surgical release, right carpal tunnel; carpal tunnel syndrome, bilateral; fibromyalgia; and obesity. *Id*. She found that Ellison's other conditions, including rib pain following a car accident, blurry vision, hearing loss caused by Eustachian dysfunction, benign skin growths, migraine headaches, depression, and anxiety, to be non-severe impairments because they did not significantly limit Ellison's ability to perform basic work activities. *See* R. 22-26. In evaluating Ellison's depression and anxiety, the ALJ found Ellison to be mildly limited in all four functional areas. *See* R. 26-28.

### A. Listing Findings

At step three, the ALJ found that Ellison did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listings. R. 28. The ALJ said in her evaluation of Ellison's conditions' severity that:

> "[a]n individual performing a cursory review of the objective evidence could conclude there has been a complicated treatment history with the diagnosed impairments interacting with and exacerbating the symptoms of other impairments. However, while such interaction was suggested in the treatment

notes prepared by some care providers, *any perceived complexity was more an artifact of the presentation of the treatment evidence* submitted by the medical facility with whom most of the claimant's care providers were associated rather than a reflection of the complexity of the information relevant to the alleged disabling impairments."

R. 28 (emphasis added). The ALJ went on to evaluate the severity of Ellison's disability under several Listings, including 1.02, Major Dysfunction of a Joint(s); 1.04, Disorders of the Spine; and 3.02, Chronic Respiratory Disorders. The ALJ also evaluated the severity of Ellison's CTS, fibromyalgia, and obesity, which she acknowledged were not part of the Listings but important considerations to the overall disability determination nonetheless.

### i.    Major Joint Dysfunction under 1.02

The ALJ concluded that Ellison was not disabled due to a major joint dysfunction under 1.02 after considering Ellison's treatment history, medical records, and testimony. Ellison reported experiencing morning stiffness and pain in her elbow, hip, knee, and ankle. R. 28-29. Blood tests and a rheumatologist failed to show a discernible cause for such pain. R. 29. Ellison previously had shoulder surgery in July 2016 and followed up with eleven physical therapy sessions until her sessions were canceled due to no-shows. *Id.* An MRI nearly a year later showed the major tendons in the shoulder to be intact with mild degenerative changes in the acromioclavicular joint. *Id.* Ellison's doctor found that she had "adequate range of motion and adequate strength" and no instability of the joint. *Id.* She received a steroid injection to help with the shoulder pain. *Id.* There was no shoulder pain or treatment addressed in the record between this time (July 2017) and April 2018. Following the denial of her application for disability benefits on reconsideration in March 2018, Ellison went to see her primary care doctor to "assess her ability to continue to work." R. 30. During that appointment, Ellison rated her pain as a nine out of ten, despite the doctor's otherwise normal

findings regarding her shoulder. *Id*. The doctor reported that the shoulder pain was likely caused by rotator cuff tendinosis and fibromyalgia. *Id*.

The ALJ also considered Ellison's history of hip pain starting in May 2015. *See* R. 31. Ellison's hip pain was somewhat successfully managed with physical therapy initially. *Id*. Doctors observed Ellison as having a normal gait and full range of motion in her hips. *Id*. An MRI revealed a bursa in her hip, and she was assessed with greater trochanteric bursitis. *Id*. Following her car accident in February 2018, Ellison reported feeling more hip pain, but she was still ambulating normally, and she had nearly full muscle strength. *Id*.

The ALJ also considered Ellison's treatment record for knee pain caused by "mild to moderate superficial delamination and fraying of cartilage at the patella, and small to moderate bone contusions" and "a small effusion and patellar chondromalacia." *Id*. The joint effusion resolved shortly with an aspiration procedure and cortisone injection, and the doctor referred Ellison to physical therapy for continued treatment of her fibromyalgia. *Id*. The pain in Ellison's knee progressed to the point that an orthopedist recommended arthroplasty on her knee, followed by physical therapy. R. 32. Ellison had surgery in June 2019 and attended physical therapy appointments two weeks later. *Id*. Ellison's range of motion appeared to improve, but she reported extreme pain to her surgeon, who prescribed her over 200 tablets of oxycodone in thirty-nine days. R. 32-33. Ellison sought additional refills of oxycodone but was denied. R. 33. Several weeks later, Ellison reported to her primary care provider that she had pain radiating from her knee to her hip, for which he prescribed thirty additional tablets of oxycodone. R. 34. At a follow-up appointment in October 2019, her surgeon found that Ellison had excellent range of motion in spite of mild tenderness in her knee. *Id*.

The ALJ ultimately found that although Ellison did have a history of chronic joint pain, there was no evidence to suggest that she had the gross joint deformity, inability to ambulate effectively, or inability to perform fine or gross manipulations with both upper extremities to meet or equal the severity of a Listing under 1.02. *Id.*

### ii.    Disorders of the Spine under 1.04

Ellison fractured her coccyx in 2016 after a fall. R. 34. She had experienced back pain prior to the facture but reported to her doctor that it had progressively worsened. *Id.* Ellison told her doctor that "everything" exacerbated the pain and that the pain lessened when she changed position. *Id.* An MRI of her lumbar spine in 2016 showed a mild concentric disc bulge and mild bilateral facet arthrosis. *Id.* She told her doctors over the following months that pain medications and physical therapy were no longer helping. An MRI in August 2017 reflected findings similar to the initial MRI. *Id.* Ellison saw Dr. Johnson, her primary care physician, in April 2018 to "assess her ability to continue working." R. 35. During this appointment, Ellison reported that she was unable to stand or sit for more than fifteen minutes without severe lower back pain. *Id.* In spite of this, Dr. Johnson observed that Ellison "ambulated with normal gait and station," that "muscle strength and muscle tone was normal in all extremities," and that "sensation response was intact in the upper and lower extremities bilaterally." *Id.* A November 2018 MRI showed no progression of degenerative changes in her lumbar spine compared to previous MRIs. *Id.* A November 2018 MRI of her cervical spine showed mild arthritic changes. A September 2019 MRI of the lumbar spine showed no significant interval changes. *Id.* A subsequent EMG/NCS showed evidence of L5 radiculopathy, no active denervation, and no evidence of compressive neuropathy or myopathy. *Id.* Because none of this evidence suggested that Ellison had experienced muscle

atrophy or weakness alongside abnormal reflexes or sensations in her lower extremities, the ALJ found that Ellison's spinal issues did not equal the severity of an impairment under 1.04. *Id*. She noted that the evidence did not suggest Ellison's trouble sitting or ambulating was caused by any spinal impairment. R. 35-36.

### iii. Chronic Respiratory Disorder under 3.02

Although Ellison did experience intermittent asthma, it was mild by all accounts. R. 36. The ALJ found that Ellison's asthma did not meet the severity of a Listing. *Id*. Ellison does not dispute findings related to her asthma.

### iv. Cumulative impact of Ellison's CTS, obesity, and fibromyalgia on her conditions

At step three, the ALJ also discussed the effect of Ellison's other conditions on her severe impairments. In April 2018, Ellison reported experiencing paresthesia in her right hand to Dr. Johnson, who then sent her for an EMG/NCS study of her bilateral upper extremities. R.37. This test yielded positive findings of CTS in both Ellison's hands. *Id*. Ellison underwent surgery for right carpal tunnel syndrome in July 2018 and reported several weeks later that surgery appeared to have resolved the numbness and tingling. *Id*. She claimed that she felt she could manage recovery on her own but would contact the clinic if her progress slowed. *Id*. The ALJ determined that Ellison's CTS was not a disabling impairment, even in conjunction with her other severe impairments.

The ALJ also observed that Ellison reported pain consistent with a fibromyalgia diagnosis to many doctors. Ellison claimed that this severe pain prevented her from even small movements like bending, dressing, and walking. R. 37-38. Dr. Johnson prescribed her gabapentin, duloxetine, and meloxicam to treat her fibromyalgia. R. 38. Ellison reported continued pain, sleep disturbance, and depression but also reported that she did not

experience fatigue or "fibro fog." *Id*. Ellison's doctor also found her to be active, alert, and oriented to time, place, and person during their appointments. *Id*. The ALJ considered these findings under SSR 14-1p, which provides guidelines for ALJs to evaluate the severity of fibromyalgia, and found that Ellison's fibromyalgia in combination with her other conditions did not medically equal a listing. R. 39. The ALJ also considered the same symptoms under SSR 03-2p for reflex sympathetic dystrophy/complex regional pain syndrome because Ellison's fibromyalgia symptoms effectively amounted to chronic pain. *Id*. The ALJ found that there was not sufficient evidence to find that Ellison's pain equaled the severity of a listing. *Id*.

Finally, the ALJ considered the impact of Ellison's obesity on her medical impairments. The ALJ stated that Ellison's BMI "ranged between 36.00 and 35.00 kg/m$^2$, placing her in the categories of level II and level III obesity." *Id*. She found that Ellison's obesity did not compound the symptoms of any impairment to a degree that Ellison was functionally limited from engaging in gainful activity. *Id*.

### B. RFC Findings

Having found that Ellison's impairments did not satisfy the criteria of any Listing, the ALJ went on to describe Ellison's RFC. The ALJ determined that Ellison was limited to sedentary work; she could occasionally lift a maximum of ten pounds; she could frequently lift and/or carry less than ten pounds; she could walk for two hours out of an eight-hour workday; she could sit for about six hours of a workday, with the option to stand for one to two minutes after sitting for thirty minutes; she could no more than occasionally reach overhead with the right upper extremity; she could no more than frequently reach in other directions with the right upper extremity; and she could no more than frequently handle,

finger, or feel with the bilateral hands.[2] R. 39-40. In establishing this RFC, the ALJ found that, while Ellison's medically determinable impairments could reasonably be expected to cause her symptoms, the intensity, persistence, and limiting effects of Ellison's reported symptoms were not entirely consistent with the medical evidence. R. 40.

The ALJ found that the medical evidence suggested that Ellison's symptoms may not have been as severe as she indicated. For instance, Ellison reported an inability to sit for more than fifteen to twenty minutes on only two occasions: her appointment with Dr. Johnson to assess her ability to continue to work and during her psychological evaluation in which she asked to stand because sitting was uncomfortable. R. 41. Ellison also claimed to not be able to reach with either arm, but none of her doctors noted any complaints about her left arm, nor did she seek any treatment for issues with it. *Id*. Additionally, she reported to her doctor that the CTS surgery had resolved her issues with her right hand. *Id*.

The ALJ limited Ellison to sedentary work noting that "when [Ellison's] symptoms of fibromyalgia, and her lumbar spine and left knee impairments were considered in combination with the exacerbating effect her weight could have on those symptoms, limiting the claimant to sedentary work was reasonable." R. 41. Limiting Ellison to sedentary work was a greater restriction than either of the state medical consultants found necessary. R. 43. The ALJ explained that she believed Ellison's impairments required more exertional restrictions than those advised by the state's medical consultants because they "appeared to have not given adequate consideration" to Ellison's CTS, asthma, and obesity. R. 43. Additionally, given Ellison's testimony that she could not sit for prolonged periods of time, and her history of a fractured coccyx, the ALJ included a limitation providing that Ellison be

---

[2] The ALJ included several additional limitations that are not relevant to the current dispute.

Case 1:21-cv-00821-SCD   Filed 09/26/22   Page 10 of 27   Document 25

permitted to stand for one or two minutes every half hour to readjust her position to reduce pain. R. 42.

The ALJ considered the medical evidence regarding Ellison's CTS and found that limiting Ellison to frequent handling, fingering, or feeling was sufficient to address her CTS symptoms. Ellison testified that she had difficulty lifting objects and maintaining her grip due to her shoulder pain and CTS. *Id.* However, her doctors found her muscle strength to be normal, Ellison reported that the CTS surgery had resolved her symptoms, and Ellison testified that, despite her symptoms, she was able to make a bracelet for her daughter. The ALJ found that limiting Ellison to frequent handling, fingering, or feeling adequately accounted for her CTS limitations, where the only evidence of the limitations was Ellison's hearing testimony. R. 42-43.

The ALJ also considered the reports of the state agency psychologists in determining Ellison's RFC but found that their reports failed to address some of Ellison's mental limitations. The state psychological consultants found on initial review and on reconsideration that Ellison was not severely limited by any mental impairments. R. 43. The ALJ also considered the opinion of the consultative psychological examiner, Dr. Krawiec, who found that Ellison was not limited in any of the four functional areas but also stated that Ellison's "'difficulties, as described, could conceivably interfere with her being able to do a good job of persisting and maintaining pace.'" *Id.* The ALJ found this unconvincing and stated that the record showed that Ellison had mild limitations in the four functional areas. R. 43-44.

The ALJ also considered Dr. Johnson's opinion that Ellison was unable to work, but determined that it had no persuasive value. R. 44. Dr. Johnson expressed in his notes

following an April 2018 appointment to "assess [Ellison's] ability to continue to work" that Ellison reported difficulty sitting, standing, lifting, gripping, and going up and down stairs. R. 1350. He also noted that Ellison reported symptoms of CTS, anxiety and depression. He concluded his notes by saying, "[i]t is my medical opinion that this patient is unable to continue to be employed due to the combination of multiple problems discussed above." R. 1350. The ALJ found that this opinion was conclusory and did not influence her disability determination because it did not contain a function-by-function analysis. R. 44.

The ALJ then found at step four that Ellison was unable to work in her past jobs but that her RFC would allow her to work in a number of jobs available, including as an order clerk, food-and-beverage; telephone information clerk; and document preparer. R. 44-45. As such, the ALJ found Ellison to not be disabled. R. 46.

The SSA Appeals Council denied Ellison's request for review, *see* R. 7-12, making the ALJ's decision a final decision of the Commissioner of the SSA, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

Ellison filed this action seeking judicial review of the decision denying her claim for disability benefits under 42 U.S.C. § 405(g). *See* ECF No. 1. The case was randomly assigned to me. All parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF No. 4, 7. Ellison filed a brief in support of her claims, ECF No. 18; Kijakazi filed a brief in support of the ALJ's decision, ECF No. 21; and Ellison filed a reply brief, ECF No. 21.

## APPLICABLE LEGAL STANDARDS

Under 42 U.S.C. § 405(g), a claimant may seek judicial review of a final administrative decision of the Social Security Commissioner. In such a case, a judge has the power to affirm,

reverse, or modify the Commissioner's final decision. *Melkonyan v. Sullivan*, 501 U.S. 89, 99–100 (1991). The court can remand a matter to the Commissioner in two ways: it may remand "in conjunction with a judgment affirming, modifying, or reversing the [Commissioner's] decision," or it "may remand in light of additional evidence without making any substantive ruling as to the correctness of the [Commissioner's] decision." *Id.* Here, Ellison seeks remand in conjunction with a decision reversing the Commissioner's decision.

The court will reverse the Commissioner's final decision only if the denial of disability benefits is "based on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). Substantial evidence simply means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Martin*, 950 F.3d at 373 (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). The court "may not re-weigh the evidence or substitute its own judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). It is limited to evaluating whether the ALJ has built an "accurate and logical bridge between the evidence and the result." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

Ellison argues that four distinct errors require reversal. First, she claims that the ALJ did not adequately consider the combined impact of her impairments in assessing her disabled status under the Listings and in determining her RFC. Second, she argues that the ALJ should have given Dr. Johnson's opinion controlling weight. Third, she argues that the ALJ committed reversible error when she decided not to send the most recent MRIs to the state's

medical consultants for additional review. Finally, she argues that the ALJ erred by evaluating the severity of Ellison's impairments under rescinded Listing requirements.

## I.     The ALJ Adequately Considered the Aggregate Impact of Ellison's Impairments

Ellison argues that the ALJ made significant mistakes in evaluating the severity of her combined conditions and in determining her RFC. As evidence that the ALJ failed to consider the combined impact of her conditions, Ellison argues that the ALJ rendered a medical opinion that the ALJ is not authorized to make. She then argues that the ALJ erred in finding her mental health conditions non-severe because she believes substantial evidence demonstrates that her anxiety and depression drastically interfered with her ability to engage in substantial gainful activity. Next, Ellison alleges that the ALJ erred in determining Ellison's RFC[3] by declining to include mental limitations and in determining that Ellison was able to frequently handle, finger, or feel despite her CTS. Finally, she claims that the ALJ erred in not fully considering the cumulative effect of her fibromyalgia and obesity on her other conditions.

First, I will dispose of Ellison's argument that the ALJ's "artifact of the presentation" statement constitutes an impermissible medical opinion. Ellison asserts that the ALJ's statement that "any perceived complexity [of the treatment history] was more an artifact of the presentation of the treatment evidence . . .rather than a reflection of the complexity of the information relevant to the . . .impairments" evidences the ALJ's failure to consider the cumulative effect of her conditions. Ellison reads this statement as the ALJ "playing doctor"

---

[3] Ellison's brief includes separate sections for "RFC Limitations," "Carpal Tunnel Syndrome," "'B Criteria,'" "Obesity in Combination," and "FM in Combination." *See* ECF No. 18 at 10-18. Because each of these sections is related to a purported error in the RFC, these sections will be addressed under one subheading. The B Criteria and mental limitations will be treated as one subject since ALJ's primarily develop mental limitations based on the B Criteria.

Case 1:21-cv-00821-SCD   Filed 09/26/22   Page 14 of 27   Document 25

and summarily determining that "Ellison's impairments individually have no interactive or cumulative effect." ECF No. 18 at 5-6.

This argument fails in light of both the plain language of the statement and the thorough discussion of Ellison's impairments throughout the opinion. The ALJ does *not* opine that the complexity of the *treatment* is an "artifact of the presentation" rather than a reflection of the complexity of the *impairments*; she opines that the complexity of the *treatment history* was an "artifact of the presentation" rather than a reflection of the *information relevant to the impairments*. In other words, the ALJ is not offering her *medical* opinion on the complexity of the medical conditions and the treatment; she is offering an opinion that the medical *evidence* was documented in a needlessly complex format. I agree; the records from Affinity Medical Group, whose doctors provided most of Ellison's treatment, can be difficult to follow as the record of each appointment contains all of Ellison's medical history, including family history, her complete vaccine record, a list of all prescriptions, and a record of every medical condition and concern she has had. *See* R. 526-888. For this reason, I do not find the ALJ's statement indicative of the ALJ's disregard for the combined effect of Ellison's conditions. Furthermore, as the remainder of this section will show, the ALJ *did* consider the combined impact of all of Ellison's conditions.

### A. Substantial evidence supported the ALJ's finding that Ellison's depression and anxiety were not severe

In arguing that her anxiety and depression were severe, Ellison significantly overstates the relevance of certain pieces of evidence that she believes the ALJ ignored. Ellison cites to a report from her anesthesiologist who documented Ellison's report that she had experienced memory loss, hallucinations, and suicidal ideation. R. 329. She points to the consultative exam with Dr. Krawiec, who diagnosed her with major depressive disorder based on her

reports that she felt "blasé" and "cranky" and her reports of poor sleep, low appetite, low energy, and "not enjoy[ing] things in life." R. 890. She points to Dr. Johnson's notes that found she has "significant anxiety and depression" based on her reports of increased anxiety regarding her other health impairments. R. 1350. She points to a meeting with a rheumatologist that noted that Ellison had "a lot of anxiety." R. 1666. However, none of these statements were the objective opinions of doctors, but rather a restatement of Ellison's subjective symptoms.

Furthermore, Ellison's review of the above-mentioned doctors' reports cherry-picks out-of-context quotes from doctors that mostly found that she was doing well with treatment. Dr. Krawiec found that Ellison's depression prognosis was "guarded to fair," her memory was intact, and she would have no difficulty understanding, remembering, and applying information. R. 890-91. Ellison also disregards Dr. Krawiec's notes that Ellison herself reported that mental health treatment and medications had resolved 75% of her mental health difficulties. R. 891. Dr. Johnson noted that Ellison reported experiencing no suicidal ideation and no fatigue despite her reports of sleep disturbances. R. 1350-51. He also observed that she was "active and alert and anxious," and in no apparent distress. R. 1351. The rheumatologist noted that Ellison's anxiety was primarily due to the stress of upcoming surgeries and family troubles. R. 1666.

Ellison notes that numerous other places in the medical evidence show that she does suffer from anxiety and depression. These references also do not reflect the overall findings of those providers, as the reference is to a note in her record that appears in several doctors' appointments completely unchanged under the Review of Systems section (ROS) that appears in every doctor's report, regardless of relevance. *See* R. 1691-92 (noting that Ellison's anxiety

is managed with medication and that she has no suicidal ideations, but the ROS noting depression and sleep disturbances); R. 1755-56 (noting the same); R. 1750 (noting depression and sleep disturbances in the ROS section even though the notes concern a dermatologist appointment).

Ellison also separately argues under the heading "Omitted Evidence" that the ALJ "ignored substantial evidence that proves that Ellison's pain-induced anxiety and depression are severe impairments that demanded mental limitations in the RFC." ECF No. 18 at 8. This section of plaintiff's brief includes a laundry list of medical records that cite various doctors' observations about Ellison's chronic pain. *Id*. at 8-10. The bulk of the references in that list reference Ellison's various physical pains, most of which the ALJ *did* find severe; only a small number directly address the pain's effect on her mental health. The medical reports that do address her mental health do not demand a finding of a severe impairment for the same reasons already discussed: they simply document Ellison's own self-reported symptoms. *See e.g.*, R. 1666 (noting, "Tracy [sic] returns today *stating* that she has been struggling with chronic pain and anxiety," (emphasis added) not "chronic, very severe pain and anxiety," as Ellison alleges in ECF No. 18 at 9.

I find that the ALJ did not ignore substantial evidence contrary to her conclusion. The evidence that Ellison claims the ALJ ignored reflected her subjective reports of symptoms, not objective evidence supporting a finding of a severe mental impairment. Ellison did not otherwise challenge the significance of the evidence that the ALJ *did* cite, so I do not find that the ALJ failed to build a logical bridge between the evidence and her conclusions. I affirm the ALJ's findings that Ellison's depression and anxiety were non-severe.

### B. The ALJ did not err in determining Ellison's RFC

Case 1:21-cv-00821-SCD   Filed 09/26/22   Page 17 of 27   Document 25

The RFC is the most a claimant can do despite his or her limitations. An ALJ must consider the combined impact of all a claimant's severe and non-severe conditions in determining the claimant's RFC. *See Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010); 20 C.F.R. §§ 404.1520(e), 404.1545(a)(2), 416.920(e), 416.945(a)(2). An RFC need not contain a limitation for every impairment. *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010). Similarly, while an ALJ "need not discuss every piece of evidence in the record," she "may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). Ellison argues that the ALJ erred in determining her RFC by not considering the combined impact of all of her conditions.

### i. Mental limitations

Ellison suggests that her anxiety and depression imposed limitations on her RFC beyond what the ALJ described. As support for this argument, Ellison points to evaluating psychologist Dr. Krawiec's statement that her combined impairments "as described, could interfere with her ability to persist and maintain pace." R. 891. The ALJ did not find that opinion persuasive and also expressed her belief that if Ellison had any issues completing a task in the evaluation, Dr. Krawiec would have noted that issue in his report. R. 43-44. Ellison claims that the ALJ's reasoning constitutes an impermissible medical opinion. But the ALJ was not giving an opinion about Ellison's depression or its treatment; she was offering her professional opinion as an arbiter of social security claims that Dr. Krawiec would document any findings relevant to such a claim. Again, Ellison conflates the ALJ providing an *opinion on medical* evidence—which is very much within an ALJ's purview—with the ALJ offering her own *medical* opinion—which clearly is disallowed.

Ellison also argues that Dr. Krawiec's finding that her impairments "as described, could interfere" with her ability to persist and maintain pace required the ALJ to create a corresponding limitation. Ellison asserts that this statement, as well as the medical evidence previously discussed, suggests that she "clearly was unable to maintain concentration for 6 hours of an 8-hour workday given her persistent and severe pain." ECF No. 18 at 12. I disagree. The qualifier "could" undercuts the proposition that the RFC *absolutely required* additional persistence and pace limitations. Courts frequently decline to reverse an RFC finding based on equivocal language like "could." *See Rumsey v. Saul*, No. 20-cv-257, 2021 WL 1921832, at *5 (E.D. Wis. May 12, 2021) ("Dr. Schinke's opinion is equivocal in that it opines only that Rumsey 'may have' various restrictions"); *Long v. Berryhill*, No. 16 CV 50060, 2017 WL 1427063, at *5 (N.D. Ill. Apr. 21, 2017) ("Dr. Carney made an ambiguous statement that plaintiff's absences 'may' be a problem on the job, but he never settled upon an opinion nor stated clearly that plaintiff's absences would prevent her from working"); *Beaver v. Kijakazi*, No. 20-CV-1003-BBC, 2022 WL 601909, at *2-4 (W.D. Wis. Mar. 1, 2022) (finding that an opinion that a claimant "would 'do best' with brief and superficial interaction" with others did not *require* limiting claimant to superficial interactions).

In addition, as previously discussed, the majority of the medical evidence Ellison cites in support of her severe mental limitations is underwhelming, internally contradictory, and not indicative of a greater limitation in persistence and pace. As such, I find that the ALJ did not err by failing to include mental limitations in the RFC based on such evidence. Furthermore, I find that substantial evidence supported the ALJ decision's *not* to include mental limitations. Throughout the medical record, Ellison's doctors note that Ellison was managing her anxiety with medication and experiencing no depression symptoms at the time

of the appointment. *See* R. 891, 1691, 1755. Both state psychological consultants found no more than mild limitations in all four functional areas. R. 82-83, 109-10. And Dr. Krawiec, on whose opinion Ellison's argument heavily relies, ultimately found her cognitive functioning to be mostly normal. R. 890. In summary, the ALJ had substantial evidence on which to base her RFC and logically explained why she gave certain evidence less weight.

Ellison also argues in conclusory fashion that the ALJ committed plain legal error by not considering "work-related functioning" in determining Ellison's RFC. She does not explain what work-related functioning is, nor does she cite any authority to support that not considering it is legal error. As such, this argument is baseless.

### ii. Carpal Tunnel Syndrome

Ellison argues that the ALJ erred by not including more stringent limitations in the RFC regarding Ellison's use of her hands in light of her CTS. In doing so, Ellison references the EMG/NCS finding of CTS in both hands, but she fails to acknowledge that the surgery on Ellison's right hand mostly resolved her symptoms.

The ALJ incorporated several limitations to accommodate Ellison's CTS: she was restricted to lifting no more than ten pounds, precluded from climbing, and limited to no more than frequent handling, fingering, or feeling. R. 42. Even though there was no medical evidence suggesting that Ellison experienced CTS-related symptoms that prevented her from working post-surgery, the ALJ stated that she would "giv[e] the claimant the benefit of the doubt and assum[e]some degree of CTS-related symptoms" and limit Ellison to no more than frequent use of her hands. R. 42-43. The only evidence to support continued trouble using her hands is Ellison's own hearing testimony. But Ellison reported that surgery resolved the numbness and tingling in her hand and that she would follow up with them if she felt that she

needed occupational therapy. R. 1761. There is nothing in the record to suggest that she did follow up, so there is no reason to believe that the abnormal sensation in her hands returned. The RFC adequately accommodated Ellison's CTS limitations and based those limitations on substantial evidence.

### iii. The record reflects that the ALJ did consider the impact of Ellison's fibromyalgia and obesity on her other conditions

Ellison supports her contention that the ALJ did not consider the impact her obesity would have on her conditions primarily with one quote from the opinion: "since the alleged onset of disability, the claimant's body mass index (BMI) ranged between 36.00 and 35.00 kg/m$^2$, placing her in the category of level II and level III obesity." R. 39. Ellison claims that this demonstrates that the ALJ did not fully account for the severity of her obesity, as her BMI at times was well over 36. The upper range of "35" clearly was a typographical error. Following this statement, the ALJ cited numerous places in the record that reflect a higher weight and BMI, the highest of which is 45.8 kg/m$^2$. Moreover, the fact that the ALJ placed Ellison in the level III category, which includes BMIs over 40, shows that she did acknowledge and consider the degree of Ellison's obesity.

Ellison also contends that the ALJ's sitting limitation does not adequately account for limitations stemming from her fibromyalgia. Ellison claims that she is unable to sit for six hours a day without severe pain caused by her previous coccyx fracture and lumbar spine issues that is exacerbated by her fibromyalgia. She acknowledges that the ALJ granted her the option to stand every half hour, but she does not explain why that is insufficient. Ellison cites numerous places in the record where doctors note that she reported trouble sitting for long periods of time, but the only places in the record mentioning a specific length of time is in Ellison's application to the SSA, Dr. Johnson's notes about Ellison's self-reported symptoms,

Case 1:21-cv-00821-SCD   Filed 09/26/22   Page 21 of 27   Document 25

and Ellison's hearing testimony. R. 284, 1350, 59. Ellison does not cite any objective medical evidence or case law indicating the sit/stand option that the ALJ provided is insufficient, so her request appears to be a request to reweigh the evidence and find the limitations insufficient. I cannot reweigh the evidence and, regardless, the ALJ based the RFC limitations on sufficient evidence and did consider the impact of Ellison's fibromyalgia and obesity on her other conditions.

The ALJ described the limiting effect of Ellison's weight and fibromyalgia in multiple places in the opinion. She explained that Ellison's "symptoms of fibromyalgia . . . in combination with the exacerbating effect her weight could have" limited Ellison to sedentary work. R. 41. The ALJ gave Ellison the option to stand for a few minutes after sitting for thirty minutes because her pain "could be exacerbated by additional stress imposed on the [previously fractured] coccyx by her weight." R. 42. She also explained that the postural limitations that she could never climb ladders, ropes, or scaffolds sufficiently accommodated the continued pain in her "right shoulder, lower back, right hip, and left knee in combination with the diffuse muscle pain due to fibromyalgia and the exacerbation of pain associated with those impairments due to the stress of her weight." *Id.* The record demonstrates that the ALJ fully considered the combined impact of all Ellison's conditions.

I find that substantial evidence supported the ALJ's findings that Ellison's depression and anxiety were non-severe; substantial evidence supported the ALJ's determination of Ellison's RFC; and the ALJ adequately considered the impact of Ellison's comorbidities on her medically determinable severe impairments.

## II.     The ALJ Did Not Err by Declining to Give Dr. Johnson's Opinion Controlling Weight

In April 2018, Ellison saw her primary care doctor, Dr. Johnson, to "assess her ability to continue work." R. 1350. Dr. Johnson's notes from that appointment include the following: "[Ellison] notes inability to stand for more than fifteen minutes without severe low back pain," "[s]he is not able to tolerate specific work stress," and "it is [his] medical opinion that [Ellison] is unable to continue to be employed." Ellison suggests that the ALJ did not give this opinion enough weight, which requires reversal. *Id*.

In her initial brief, Ellison argues that the law required the ALJ to give Dr. Johnson's opinion controlling weight. *See* ECF No. 18 at 18-20. As the Commissioner points out, 20 C.F.R. §§ 404.1520c(a) and 416.920c(a) modified the law for all claims, like Ellison's, filed after March 27, 2017. Under the new regulation, no medical opinion, including one from a claimant's doctor is entitled to specific evidentiary weight, including controlling weight. In her reply brief, Ellison backpedals and says that under the new regulation, the ALJ needed to consider the supportability and consistency of Dr. Johnson's medical opinion in deciding the weight to give it, and that because Dr. Johnson's opinion was supported by other evidence and consistent with the rest of the medical record, his opinion was entitled to great weight.[4]

By failing to argue the supportability and consistency of Dr. Johnson's opinion in her initial brief, Ellison has forfeited this argument. *See Jerry B. v. Kijakazi*, No. 1:21-CV-02177-SEB-MG, 2022 WL 3684798, at *4 (S.D. Ind. July 29, 2022), ("The Seventh Circuit has said that a social security claimant forfeits arguments not raised and developed in his or her opening brief") (citing *Brown v. Colvin*, 661 F. App'x 894, 895 (7th Cir. 2016)). However, even if she had not, I do not find Dr. Johnson's opinion to be supported by thorough examination

---

[4] Ellison's reply brief also argues an incorrect standard for the supportability factor. Supportability concerns the evidence and explanations supporting a provider's opinion *within the opinion itself. See* §§ 404.1520c(c)(1) and 416.920c(c)(1).

and explanation nor do I find it consistent with other evidence in the record, which does not support an inability to work. *See supra*, Section I. More importantly, Dr. Johnson is not qualified to give an opinion on a claimant's disability status. *See* 20 C.F.R. § 404.1520b(c)(3)(i) (explaining that "statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work" are "inherently neither valuable nor persuasive" because such issues are reserved to the Commissioner.) An ALJ need not give weight to an opinion that is "conclusory and not supported by any clinical basis." *Cooley v. Berryhill*, 738 F. App'x 877, 880 (7th Cir. 2018).

Ellison also argues that the ALJ did not even acknowledge Dr. Johnson's findings of severe fibromyalgia, "Listing level ruptured disc," coccyx fracture, extreme obesity, and CTS. ECF No. 22 at 10. This argument is misleading and incorrect. First, Dr. Johnson did not make any new findings in this appointment about Ellison's fibromyalgia, coccyx fracture or obesity. His opinion mentions these conditions only in the context of how they prevented Ellison from continuing to work, which is something the doctor cannot assess. Second, Dr. Johnson mentions nothing of a "Listing level ruptured disc"; he merely opines that Ellison continued to struggle with previously established back pain and referred her for further imaging. Finally, the ALJ *did* consider the diagnosis of CTS, but she found that Ellison's subsequent surgery had properly resolved most of the symptoms. The ALJ considered the impact of all these diagnoses throughout the opinion; she did not need to mention them in the context of Dr. Johnson's opinion from this appointment when this appointment did not uncover any significant new findings about her conditions. *See Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004) ("[I]t would be a needless formality to have the ALJ repeat substantially

similar factual analyses at both steps three and five."). The ALJ's dismissal of Dr. Johnson's opinions regarding Ellison's ability to continue working does not require reversal.

## III. The ALJ Did Not Err by Not Seeking Further Medical Consultation on Ellison's Spinal MRI

Ellison next argues that the ALJ erred by not seeking further medical consultation following an MRI conducted in 2019. The MRI showed that Ellison had a herniated disc, which her doctors were concerned compressed her nerve root. An EMG/NCS showed that Ellison suffered from chronic L5 radiculopathy. The ALJ did not seek additional guidance from the medical consultants based on the MRI and the EMG/NCS results. Had this evidence reflected "new, significant medical diagnoses" that "reasonably could have changed the reviewing physician's opinion," then the medical consultants' reliance on the 2017 MRI could warrant conducting a new assessment. *Moreno v. Berryhill*, 882 F.3d 729, 730 (7th Cir. 2018). However, the radiologist conducting the MRI found that there was no significant change between the 2017 MRI that the consultants referenced and the 2019 MRI that they did not. Ellison correctly states that the case law does not allow an ALJ to interpret and give medical opinions on MRI results, *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014), but that is not what the ALJ did here.

The court in *Goins* reversed the ALJ's decision because the (1) the ALJ formed her own opinion that new evidence was not medically significant enough to change the state psychology consultants' opinions, (2) she relied heavily on those consultants' uninformed opinions in developing the RFC; and (3) she looked at the MRI in question individually and not as part of a larger medical history. Here, (1) the ALJ did not form her own medical opinion on the significance of the evidence, but rather relied on the radiologist's opinion; (2) the ALJ

did not rely on the consultants' opinions; and (3) the MRI was compared with past MRIs to give a more complete picture of the change in the claimant's condition.

First, the main reason behind the reversal of the ALJ in *Goins* is that the ALJ cannot form medical opinions. Here, the ALJ did not form her own opinion that the MRI did not show significant change. She gave significant weight to the *opinion of the radiologist* that there was no significant change. Unlike the ALJ, the radiologist is qualified to make this opinion, and the ALJ can determine the weight to assign to that opinion. Next, the ALJ here did not rely on the consultants' opinions because she found them to be insufficient to address the severity of Ellison's symptoms anyway. A change in the consultants' opinion would not necessarily lead to a change in the ALJ's decision, as it would have in *Goins*, because she disregarded the opinion. Finally, unlike the MRI in *Goins*, the opinion here that there was no significant change in Ellison's condition was based on a comparison between a two-year-old MRI and the most recent MRI. In *Goins*, the court reversed not only because the ALJ formed a medical opinion, but also because the ALJ "made no effort to compare the 2010 MRI with the earlier one" when the 2010 MRI showed a significant deterioration in the claimant's condition. *Id*. Here, Ellison's argument that "the reader has no idea that a central disc protrusion or an annular fissure was present at L5-S1," ECF No. 18 at 22, conflicts with the radiologist's determination that the newest MRI did not add any new and significant findings to the 2017 MRI, in which he noted "mild central disc protrusion with mild bilateral facet degeneration," and "posterior annular defect at L5-S1." R. 985. As such, the MRI in question in this case differs from the MRI that the court in *Goins* found to be medically significant.

## IV. The ALJ Did Not Err in Evaluating Ellison Under Former Listing Criteria

Finally, Ellison contends that the ALJ evaluated the severity of her conditions under the wrong listings because the new listings must be used for all claims filed after March 27, 2017. This misstates the law, as the new listings went into effect on April 2, 2021, and apply only to the applications filed after that date. *See* SSA, Revised Medical Criteria for Evaluating Musculoskeletal Disorders, 85 Fed. Reg. 78164 (Dec. 3, 2020). The ALJ did not err.

## CONCLUSION

For all of the reasons explained above, I find that (1) Ellison has not demonstrated that the ALJ failed to consider her conditions' combined effect on her ability to work, (2) the ALJ did not commit reversible error in evaluating Dr. Johnson's opinion, (3) the ALJ did not commit reversible error by failing to seek additional medical consultation in light of the 2019 MRI, and (4) the ALJ assessed Ellison's impairments under the correct Listings. Thus, I **AFFIRM** the Commissioner's decision. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 26th day of September, 2022.

STEPHEN C. DRIES

United States Magistrate Judge